# IN THE SUPREME COURT OF IOWA

No. 18–1050

Filed June 14, 2019

**ALEX WAYNE WESTRA,**

Appellant,

vs.

**IOWA DEPARTMENT OF TRANSPORTATION,**

Appellee.

---

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

A motorist appeals a district court ruling denying his petition for judicial review of an agency decision suspending his driver's license for one year. **AFFIRMED.**

Matthew T. Lindholm of Gourley, Rehkemper, & Lindholm, P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Robin G. Formaker, Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

This case began when a driver tried to reverse course. But it presents the question whether *our court* should reverse course. Specifically, should we overrule precedent and apply the exclusionary rule to driver's license revocation proceedings when an Iowa statute dictates otherwise?

In *Westendorf v. Iowa Department of Transportation*, 400 N.W.2d 553, 557 (Iowa 1987), *superseded by statute as recognized by Brownsberger v. Department of Transportation*, 460 N.W.2d 449, 450–51 (Iowa 1990), we declined to apply the exclusionary rule so long as the enumerated statutory conditions for license revocation were met. Later, the general assembly enacted a limited exception to *Westendorf*. *See* Iowa Code § 321J.13(6) (2017). This requires the Iowa Department of Transportation (DOT) to rescind revocation of a driver's license if there has been a criminal prosecution for operating while intoxicated (OWI) and the criminal case determined that the peace officer did not have reasonable grounds to believe a violation of the OWI laws had occurred or that the chemical test was otherwise inadmissible or invalid. We affirmed the limited nature of that exception in *Manders v. Iowa Department of Transportation*, 454 N.W.2d 364, 366–67 (Iowa 1990).

In the present case, a driver was pulled over by a DOT officer after he stopped on I-80 to make unauthorized use of a median crossover in order to turn around and head in the other direction. It turned out he had an open container in his car and smelled of an alcoholic beverage. After he refused all testing, his license was suspended for one year, but he was never charged with OWI. Adhering to our *Westendorf* and *Manders* precedents, the DOT upheld his license suspension. Notably, the driver's only challenge to the stop was that the DOT officer lacked statutory

authority; the driver did not contest reasonable suspicion for the stop. The district court also denied relief, leading to this appeal.

We are now asked, in effect, to expand the legislature's post-*Westendorf* statutory exception and apply the exclusionary rule to all driver's license revocation proceedings if there was any problem with the stop. For the reasons discussed herein, we decline to do so and instead adhere to the legislative boundaries of the exception when the only legal flaw in the stop was the officer's lack of statutory authority. Accordingly, we affirm the judgment of the district court upholding the license revocation in this case.

## I. Facts and Procedural History.

On May 9, 2017, at approximately 12:26 a.m., Officer Austin Wilson of the DOT was patrolling westbound on I-80, a four-lane divided interstate highway, in Jasper County. At a location where there was a median crossover marked for use by authorized vehicles only, Officer Wilson observed an eastbound vehicle coming to a stop. It appeared the driver was preparing to use the crossover, turn around, and head westbound. Officer Wilson took the crossover himself and when the driver of the eastbound vehicle decided to keep going eastbound on I-80, Officer Wilson pulled it over using his overhead lights.

The driver of the vehicle, Alex Westra, admitted he had been about to make a turnaround using the median crossing and knew it was a bad idea. Officer Wilson noticed that Westra had bloodshot and watery eyes and saw an open container of Four Loko (an alcoholic beverage) within arm's reach. Westra initially denied knowing there was a beverage can in his vehicle. He refused to hand over the beverage can and refused to step out of his vehicle.

When a backup officer arrived, Officer Wilson removed Westra from his vehicle. Officer Wilson could smell the odor of an alcoholic beverage coming from Westra's person. In addition, on inspection, the can of Four Loko had only one-quarter of its contents remaining.

Westra declined to undergo any preliminary testing for intoxication. Officer Wilson escorted Westra to the Jasper County jail where Westra was read the implied consent advisory and made two phone calls. Westra then refused to take the Datamaster chemical test.

Westra was never charged with OWI but was charged with two traffic violations—stopping on a travelled portion of I-80 in violation of Iowa Code section 321.354 and driving with an open container of an alcoholic beverage in violation of section 321.284. Westra filed a motion to suppress in the traffic case, contending that Officer Wilson of the DOT lacked statutory authority to stop him on May 9 on I-80. *See Rilea v. Iowa Dep't of Transp.*, 919 N.W.2d 380, 383 (Iowa 2018). The motion was overruled, and Westra was found guilty and sentenced to pay fines of $100 and $200 respectively for the two violations. Westra appealed to the district court, however, which found that the DOT stop was invalid and dismissed the two citations.

Meanwhile, the DOT notified Westra that his driver's license was being revoked for one year under Iowa Code section 321J.9. Westra requested an administrative hearing, and on July 11 he received a telephonic hearing before an administrative law judge (ALJ). The issue at the hearing was whether DOT Officer Wilson had statutory authority to stop Westra's vehicle. The ALJ entered a decision on August 15 finding that he did. The ALJ reasoned that "Officer Wilson was operating within his authority as a designated peace officer under [section] 321J.8(3)" relating to enforcement of OWI laws. As the ALJ explained,

> Although he could not have been assured that the driver of the pickup he observed that night was impaired by alcohol or other substances, he did see it was being operated in an erratic or illegal manner which can be a part of a finding of reasonable grounds for a possible violation of section 321J.2 as set out above. It is reasonable to find the Appellant's actions of coming to a stop on a traveled portion of a two-lane interstate highway and doing so in a proximity to a median cross-over lane he could not legally use were valid reasons for Officer Wilson [to] perform a traffic stop at that time.

Westra appealed this decision to the director of the DOT. On September 21, the director agreed with the ALJ that Officer Wilson had statutory authority to enforce the OWI laws as to Westra. He also found that Westra's argument for suppression of his refusal to take the chemical test was immaterial because the exclusionary rule did not apply to this driver's license revocation proceeding.

Westra petitioned for judicial review in the Polk County District Court. Following a hearing, the district court issued a ruling on May 17, 2018. The district court found that "Officer Wilson did not have statutory authority to stop Westra." However, it declined to hold under article I, section 8 of the Iowa Constitution that the exclusionary rule applied to Westra's license revocation proceeding. It also rejected Westra's alternative argument that article I, section 9 of the Iowa Constitution (the Due Process Clause) required exclusion of Westra's refusal to take the Datamaster chemical test. Westra appealed and we retained the appeal.

## II. Standard of Review.

Factual findings of the DOT are reviewed for substantial evidence unless the underlying claim is a constitutional one, in which case review of facts is de novo. *See* Iowa Code § 17A.19(10)(*f*). Both parties agree that we do not defer to the DOT's interpretations of Iowa Code section 321J.13(6) or, of course, to the DOT's views on the Iowa Constitution. *See*

*id.* § 17A.19(10)(*c*); *Bearinger v. Iowa Dep't of Transp.*, 844 N.W.2d 104, 106 (Iowa 2014).

### III. Legal Analysis.

**A. Whether Officer Wilson Had Authority to Stop Westra.** The first question is whether Officer Wilson had statutory authority to stop Westra on I-80 on May 9, 2017. Westra's claim goes away if Officer Wilson had such authority. In *Rilea,* we held that until new legislation became effective on May 11, DOT officers lacked authority to issue traffic citations unrelated to operating authority, registration, size, weight, or load. 919 N.W.2d at 383. However, we also clarified that Iowa Code chapter 321J provided a separate font of authority, and "an IDOT [motor vehicle enforcement] officer, if properly trained, can enforce chapter 321J." *Id.* at 392. In doing so, we relied on Iowa Code section 321J.1(8)(*e*), which states that a "peace officer" for purposes of chapter 321J includes "[a]ny other law enforcement officer who has satisfactorily completed an approved course relating to motor vehicle operators under the influence of alcoholic beverages." *Id.*

Yet we decided another case the same day. *See State v. Werner*, 919 N.W.2d 375 (Iowa 2018). *Werner* involved a motorist who had been stopped by a DOT officer for speeding and who was only later determined to have been driving under revocation in violation of Iowa Code section 321J.21. *Id.* at 376. Under these circumstances, we concluded the State could not rely on the DOT officer's chapter 321J enforcement authority. *Id.* at 380. We noted, "Whatever merit this argument may have in other contexts, there is no indication Officer Glade knew or suspected Werner's driver's license had been revoked for operating while intoxicated when he made the August 18 stop." *Id.*

We believe the quoted language from *Werner* controls here. On this record, we are not persuaded that Officer Wilson "knew or suspected" Westra was driving under the influence when he stopped his vehicle. Officer Wilson's testimony contains no inkling of this.

The DOT found that Officer Wilson could rely on his enforcement authority in chapter 321J based on the following reasoning: "[H]e did see [the vehicle] was being operated in an erratic or illegal matter which can be a part of a finding of reasonable grounds for a possible violation of section 321J.2 as set out above." If this were a finding that Officer Wilson was actually engaged in OWI enforcement when he stopped Westra, it might carry the day. However, this was merely a finding that the driving behavior Officer Wilson observed *could have* helped provide the basis for a reasonable suspicion finding. Under *Werner*, Officer Wilson's stop was invalid.

**B. Whether Article I, Section 8 Required Suppression of Westra's Refusal to Take the Chemical Test.** Because we agree with the district court that Officer Wilson lacked statutory authority to stop Westra on I-80, we must consider whether the Iowa Constitution required suppression of Westra's refusal to take the chemical test and, thus, would require us to unwind his license revocation. To do so, we will first review the relevant statutes and caselaw relating to license revocation hearings. Then we will address the heart of Westra's argument.

1. *License revocations in Iowa and the evidence that can be considered.* As of 1985, Iowa law provided that a license revocation hearing

> shall be limited to the issues of whether a peace officer had reasonable grounds to believe that the person was operating a motor vehicle in violation of section 321.281 [now section 321J.2] and either of the following:

    *a.* Whether the person refused to submit to the test or tests.

    *b.* Whether a test was administered and the test results indicated an alcohol concentration [above the legal limit].

Iowa Code § 321B.26(*a*)–(*b*) (1985).

In *Westendorf*, a case decided under this law, we held that the Fourth Amendment exclusionary rule did not apply to driver's license revocation proceedings. 400 N.W.2d at 557. The driver sought to challenge his license revocation on the ground that the police officer had lacked probable cause to stop his vehicle. *Id.* at 554. The district court agreed and overturned the revocation. *Id.* We, however, reversed and reinstated the revocation. *Id.* at 557.

We pointed out that "the statutory conditions for revocation by the department were clearly satisfied." *Id.* at 555. We acknowledged,

> Had the evidence demonstrated that any one of the listed statutory conditions was not present—for example that the officer did not have "reasonable grounds to believe Westendorf had been operating the motor vehicle in violation of section 321.281" the department would not have been warranted in revoking Westendorf's driver's license.

*Id.* Yet in the absence of such a statutory ground for excluding the evidence, we held that the driver could not challenge his license revocation under the Fourth Amendment. *Id.* at 556–57. We explained,

> The benefit of using reliable information of intoxication in license revocation proceedings, even when that evidence is inadmissible in criminal proceedings, outweighs the possible benefit of applying the exclusionary rule to deter unlawful conduct. Consequently, the exclusionary rule formulated under the fourth and fourteenth amendments was inapplicable in this license revocation proceeding.

*Id.* at 557.

The following year, the general assembly amended the law to provide drivers with certain additional grounds for challenging license revocations.

*See* 1988 Iowa Acts ch. 1214, § 2 (codified at Iowa Code § 321J.13(4) (1989)).  In current form, this provision reads,

> *b.* The person shall prevail at the [license revocation] hearing if, in the criminal action on the charge of violation of section 321J.2 or 321J.2A resulting from the same circumstances that resulted in the administrative revocation being challenged, the court held one of the following:
>
> (1) That the peace officer did not have reasonable grounds to believe that a violation of section 321J.2 or 321J.2A had occurred to support a request for or to administer a chemical test.
>
> (2) That the chemical test was otherwise inadmissible or invalid.

Iowa Code § 321J.13(6)(1)–(2) (2017).

Two years thereafter, in *Manders*, we upheld another driver's license revocation, again approving of the DOT's refusal to consider the driver's claim that the stop of his vehicle lacked reasonable cause.  454 N.W.2d at 365.  We also made clear that the 1988 amendment applied only "in the limited situation in which an adjudication on the admissibility of evidence relevant to the implied consent law has been made in a criminal proceeding growing out of the same facts."  *Id.* at 366.

Later that same year, in *Brownsberger*, we confronted the case of a driver whose license had been revoked but who had received a favorable ruling on his motion to suppress in the parallel criminal prosecution.  460 N.W.2d at 450.  We concluded,

> By its terms, the statute binds the DOT to certain action taken by the district court in separate criminal proceedings arising out of the same circumstances.  Moreover, the remedy fashioned by the legislature is clearly exclusionary in nature. The department *must* rescind any license revocation that flows from police action which is subsequently found by the court to be without reasonable grounds for belief that the OWI law has been violated.

*Id.* at 451.

More recently, in *State v. Taeger*, 781 N.W.2d 560, 566 (Iowa 2010), a driver claimed the State had sought "to avoid the application of Iowa Code section 321J.13(6) by preemptively moving to dismiss the criminal OWI action when it became clear that he would prevail on the motion to suppress." We reviewed the landscape as already filled in by *Westendorf*, the 1988 amendment, *Manders*, and *Brownsberger*. *Id.* at 565–66. We then made clear that a dismissal to avoid the effects of section 321J.13(6) would not be "in the furtherance of justice" as required by Iowa Rule of Criminal Procedure 2.33(1) governing dismissals of criminal actions. *Id.* at 566–67.

Westra does not dispute that the literal terms of Iowa Code section 321J.13 provide him no relief. The section expressly provides that the revocation hearing "shall be limited to" whether a peace officer had reasonable grounds to believe the driver was operating a motor vehicle under the influence and whether the driver refused to submit to chemical testing (or had an alcohol concentration in excess of the legal limit). Iowa Code § 321J.13(2). Westra does not dispute that those two preconditions for revocation were met. Additionally, to benefit from section 321J.13(6), Westra must have obtained a ruling "in the criminal action" that the chemical test "was otherwise inadmissible or invalid." *Id.* § 321J.13(6)(*b*). That did not occur.

Nonetheless, Westra argues that it would be incongruous to permit challenges to the legality of a driver stop to be raised in a revocation proceeding only when there was a parallel criminal proceeding in which a motion to suppress is granted. As he puts it, the enactment of Iowa Code section 321J.13(6) "seemingly erodes" *Westendorf*'s cost–benefit rationale. He argues,

> Unfortunately, what was not contemplated by the legislature was factual scenarios like the present one where a license holder is not afforded the protections of Iowa Code Section 321J.13(6) either because a criminal charge for OWI is not filed or was voluntarily dismissed before a suppression ruling could be obtained.

Regardless of the possible merits of these policy arguments, we are not free to rewrite the statute. In *Manders*, which we decided only two years after the predecessor to Iowa Code section 321J.13(6) was enacted, we found that the statute required "an adjudication on the admissibility of evidence . . . in a criminal proceeding growing out of the same facts." 454 N.W.2d at 366. There was no such adjudication here. Westra never faced an OWI criminal prosecution.

Furthermore, Iowa Code section 321J.13 has been amended a host of times since 1990. Most notably, the general assembly deleted the provision in question in 1997, *see* 1997 Iowa Acts ch. 104, § 31 (removing Iowa Code § 321J.13(4) (codified at Iowa Code § 321J.13 (Supp. 1997))), but then restored it in 1999. *See* 1999 Iowa Acts ch. 13, § 22 (codified at Iowa Code § 321J.13(6) (Supp. 1999)). This makes the argument that the legislature didn't realize what it was doing hard to sustain. *See Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 599–600 (Iowa 2011) ("These guiding principles are especially salient when the general assembly has reenacted or repeatedly amended the statutory provision in question without disturbing our previous interpretation.").

2. *Iowa Code section 804.20.* Westra also observes that we have allowed violations of Iowa Code section 804.20 to be grounds for exclusion of a refusal to take the chemical test in driver's license revocation proceedings. *See Didonato v. Iowa Dep't of Transp.*, 456 N.W.2d 367, 369 (Iowa 1990); *Ferguson v. Iowa Dep't of Transp.*, 424 N.W.2d 464, 466 (Iowa 1988), *abrogated by State v. Hicks*, 791 N.W.2d 89, 94 (Iowa 2010). But

this rule of exclusion is longstanding and predates *Westendorf* and *Manders*.  *See Fuller v. Iowa Dep't of Transp.*, 275 N.W.2d 410, 411 (Iowa 1979) (announcing this rule).  When we decided *Fuller*, the first case announcing this rule, chapter 321J's predecessor did not expressly limit the issues that could be raised in revocation proceedings.  *See* Iowa Code § 321B.8 (1977).  In 1984, the legislature amended the license revocation law to expressly limit the issues that could be raised in license revocation proceedings.  *See* 1984 Iowa Acts ch. 1292, § 17 (codified at Iowa Code § 321B.26 (1985)) (changing "its scope shall cover" to "its scope shall be limited to").  Nonetheless, without discussing this 1984 amendment, we later reaffirmed *Fuller* in *Ferguson* and *Didonato*.  *See Ferguson*, 424 N.W.2d at 466; *see also Didonato*, 456 N.W.2d at 369.  In *Didonato* we discussed and then expressly distinguished *Manders*, explaining that section 804.20 was "broadly applicable."  456 N.W.2d at 369.  Hence, the argument that Westra raises now with respect to section 804.20 was thoroughly aired and considered by our court twenty-nine years ago.

Iowa Code section 804.20 provides the arrestee with "a limited statutory right to counsel before making the important decision to take or refuse a chemical test under implied consent procedures."  *State v. Vietor*, 261 N.W.2d 828, 831 (Iowa 1978).  Section 804.20 thus involves a right to counsel and helps insure that the decision to refuse the test, and subject oneself to license revocation for at least a year, is informed.  *See State v. Walker*, 804 N.W.2d 284, 289–91 (Iowa 2011).  Violations of section 804.20 are a simple misdemeanor.  *See* Iowa Code § 804.20 (2017).  Accordingly, we reaffirm that the provisions of section 804.20 are "broadly applicable" to license revocation proceedings.  *Didonato*, 456 N.W.2d at 369.  Still, that does not provide a reason to overrule our precedent and disregard the

specific terms of section 321J.13(6) in a case where section 804.20 does not apply.

3. *Article I, section 8.* We now come to Westra's principal appellate argument that article I, section 8 of the Iowa Constitution requires suppression of his refusal to take the chemical test. In his view, the legislature cannot limit the scope of the license revocation hearing to exclude such issues.

Looking outside Iowa, most states do not apply the exclusionary rule in driver's license revocation proceedings. *See generally* Thomas M. Fleming, Annotation, *Admissibility, in Motor Vehicle License Suspension Proceedings, of Evidence Obtained by Unlawful Search and Seizure*, 23 A.L.R.5th 108 (1994).

Westra cites five cases to the contrary, but they appear to be based largely on interpretation of the specific state statutes that were at issue. For instance, in *State v. Lussier*, 757 A.2d 1017, 1021 (Vt. 2000), the Vermont Supreme Court reasoned as follows in concluding that a driver could raise the constitutionality of the stop in a license suspension proceeding:

> [A] rational interpretation of [the Vermont license suspension law] would permit defendants to challenge the reasonableness of the officer's belief based on the fact that it was derived from an unlawful stop. The State seeks a more narrow interpretation, however, which would permit law enforcement officers to make random stops of vehicles for any or no reason at all in the hopes of detecting drunk drivers. . . . License suspensions could follow the unlawful police conduct as long as at any point after the stop the officer formed a reasonable belief that the defendant was intoxicated. We cannot conceive that the Legislature intended to insert into the civil suspension system all of the statutory rights concerning consent to evidentiary tests, and at the same time to dispense with basic constitutional protections against unreasonable governmental intrusions. Accordingly, we decline the State's invitation to attribute to the Legislature the intent to sanction

unconstitutional police conduct in the context of civil suspension proceedings.

(Citations omitted); *see also Fla. Dep't of Highway Safety & Motor Vehicles v. Hernandez*, 74 So.3d 1070, 1079 (Fla. 2011) ("[R]eading the two statutes together leads to the conclusion that there must be a means for challenging the legality of the suspension when the request for a breath test was *not* incident to a lawful arrest."); *People v. Krueger*, 567 N.E.2d 717, 722–23 (Ill. App. Ct. 1991) ("[T]he issue here is . . . whether the statute should be construed to condition the Secretary of State's power to suspend a driver's license on the presence of a valid arrest."); *Schuster v. State Dep't of Taxation & Revenue*, 283 P.3d 288, 294 (N.M. 2012) ("[T]he requirement in [New Mexico law] that MVD find that 'the person was arrested' requires a finding that the arrest and police activity leading to the arrest were constitutional."); *Watford v. Bureau of Motor Vehicles*, 674 N.E.2d 776, 778 (Ohio 1996) (per curiam) (relying on *Williams v. Ohio Bureau of Motor Vehicles*, 610 N.E.2d 1229, 1231 (Ohio Mun. Ct. 1992), which determined the issue as a matter of statutory construction); *Pooler v. Motor Vehicles Div.*, 755 P.2d 701, 703 (Or. 1988) (en banc) ("[W]e conclude that the legislature must have intended a valid arrest when it used the term 'under arrest' in that statute."). It is true some of these decisions have constitutional elements. *See Lussier*, 757 A.2d at 1025–27 (adding in dicta that the exclusionary rule under the Vermont Constitution applies to civil suspension proceedings); *see also Schuster*, 283 P.3d at 294.

At the same time, a number of states have held that their state constitutions do not require exclusion of evidence obtained through unconstitutional traffic stops in administrative license revocation proceedings. *See Nevers v. State*, 123 P.3d 958, 964 (Alaska 2005) (rejecting the application of the exclusionary rule to administrative license

revocation hearings under both the Fourth Amendment and the Alaska Constitution and stating, "[W]e do not believe that applying the exclusionary rule for search and seizure violations would add significant deterrence because the police are already sufficiently deterred from such unlawful conduct by the applicability of the exclusionary rule to all criminal cases that may result from their investigations."); *Francen v. Colo. Dep't of Revenue*, 411 P.3d 693, 702–03 (Colo. App. 2012) (finding that the exclusionary rule under the United States and Colorado Constitutions does not apply in civil revocation proceedings); *Martin v. Kan. Dep't of Revenue*, 176 P.3d 938, 953 (Kan. 2008) ("Any additional deterrent effect on law enforcement violation of the Fourth Amendment and [the Kansas Constitution] to be gleaned from extension of the rule beyond the criminal DUI setting would be minimal, and it cannot outweigh the remedial imperative of preventing alcohol-and/or drug-impaired drivers from injury or killing themselves or others."), *overruling on other grounds recognized by State v. Gray*, 403 P.3d 1220, 1225 (Kan. 2017); *Riche v. Dir. of Revenue*, 987 S.W.2d 331, 334 (Mo. 1999) (en banc) (declining to apply the exclusionary rule under the United States and Missouri Constitutions to driver's license revocation proceedings); *Jacobs v. Dir., N.H. Div. of Motor Vehicles*, 823 A.2d 752, 755 (N.H. 2003) (rejecting the argument that the New Hampshire Constitution requires exclusion of evidence obtained from a constitutionally invalid stop in a driver's license suspension proceeding).

We have never directly confronted whether article I, section 8, as opposed to the Fourth Amendment, would require exclusion of evidence obtained from an unconstitutional stop in a license revocation proceeding. On the other hand, we have held that the article I, section 8 exclusionary rule does not apply to probation revocation hearings. *Kain v. State*, 378 N.W.2d 900, 902–03 (Iowa 1985). In *Kain,* we rejected a probationer's

claim that the fruits of an illegal investigatory stop of his motor vehicle should have been suppressed in his probation revocation hearing. *Id.*

In *State v. Cline*, 617 N.W.2d 277, 293 (Iowa 2000) (en banc), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001), we declined to adopt the good faith exception to the exclusionary rule under article I, section 8, reasoning that "[t]o do so would elevate the goals of law enforcement above our citizens' constitutional rights, a result not supported by any principle of constitutional law." *Id.* at 293. *Cline*, in other words, placed a high value on the courts not condoning a violation of constitutional rights. *See id.* at 292–93.

4. *The stop in this case.* Yet a question arises whether *the stop itself* in this case was unconstitutional under article I, section 8. Westra does not dispute he violated the traffic laws: he brought his vehicle to a halt on the traveled portion of I-80 while preparing to make an illegal turn across the median. Westra has not explained why a traffic stop that was merely in excess of the officer's statutory authority would trigger a constitutional right to have evidence suppressed. *See Werner*, 919 N.W.2d at 377 (noting that a case challenging a DOT officer's stop involved the suppression of evidence "on statutory grounds").

There are some out-of-state authorities declining to apply the exclusionary rule in criminal cases where the only issue was the officer's statutory authority. In *People v. Wolf*, 635 P.2d 213, 214, 218 (Colo. 1981) (en banc), the Colorado Supreme Court declined to apply the exclusionary rule when police arrested the defendant outside the territorial limits of their authority. The court explained, "Despite the fact that the Denver police violated the statutes governing their authority to arrest, the issue, for purposes of application of the exclusionary rule, is whether the arrest was unconstitutional." *Id.* at 217. Because there was probable cause for

the arrest, it "did not offend against constitutional restraints on unreasonable seizures," and the court did not impose the exclusionary rule. *Id.* at 217–18; *see also State v. Green*, 354 P.3d 446, 451 (Idaho 2015) ("Because these subsequently enacted arrest standards are merely statutory, constitutional remedies are inappropriate when those statutes have been violated by police. Although the Legislature could certainly specify suppression as the remedy for police violation of one of these statutes, because such a statutory violation is not a constitutional violation, suppression is not warranted absent such a legislative directive."); *State v. Gates*, 145 So.3d 288, 304 (La. 2014) ("Even if we assume Officer Bell acted outside of his territorial jurisdiction in the detention of the defendant, suppression of the evidence obtained after Mr. Gates' detention would not be warranted. The statutory rules which delineate the territorial zones of responsibility of various law enforcement agencies are not designed to prevent unreasonable invasions of privacy. There are no constitutional grounds present here to justify the suppression of evidence."); *State v. Keller*, 396 P.3d 917, 925–26 (Or. 2017) (finding that an unauthorized stop by a Washington police officer that would have been legal if performed by an Oregon police officer did not violate the Oregon Constitution and therefore the suppression of evidence in a driving-while-intoxicated case was not required).

In *Virginia v. Moore*, 553 U.S. 164, 178, 128 S. Ct. 1598, 1608 (2008), the United States Supreme Court held that "[w]hen officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest," regardless of whether the procedure violates state law or not. State law, in other words, did not affect the federal constitutional analysis. *See id.*

We acknowledge that in *State v. Brown*, 39 N.E.3d 496, 502 (Ohio 2015), the Ohio Supreme Court held that "a traffic stop for a minor misdemeanor offense made by a township police officer without statutory authority to do so violates Article I, Section 14 of the Ohio Constitution." The court reasoned,

> The government's interests in permitting an officer without statutory jurisdiction or authority to make a traffic stop for a minor misdemeanor offense in these circumstances is minimal and is outweighed by the intrusion upon the individual's liberty and privacy that necessarily arises out of the stop. Accordingly, the traffic stop and the ensuing search and arrest in this case were unreasonable and violated Article I, Section 14 of the Ohio Constitution, and the evidence seized as a result should have been suppressed.

*Id.* In that case, a local township police officer pulled over a motorist for a lane violation on the interstate in excess of his statutory authority, eventually leading to a criminal conviction for possession of oxycodone. *Id.* at 497–98; *see also State v. Cuny*, 595 N.W.2d 899, 903 (Neb. 1999) (holding that an extraterritorial stop performed by Pine Ridge Reservation police officers in Nebraska violated the Nebraska Constitution); *State v. Barker*, 25 P.3d 423, 425–26 (Wash. 2001) (en banc) (holding that an out-of-state officer's arrest violated the Washington Constitution, which expressly requires "authority of law"). Even these cases, however, do not present the issue of whether the officer's statutory authority may be raised in a civil license revocation proceeding.

We are not persuaded that a stop by a DOT enforcement officer in excess of his statutory enforcement authority, but based upon reasonable suspicion and probable cause, amounts to a constitutional violation. A *constitutional* violation does not occur every time a peace officer simply fails to adhere to a *statute*. Only those violations that amount to "unreasonable seizures or searches" violate article I, section 8. In our view,

the main purpose of Iowa Code section 80.22 was not to protect the privacy interests of motorists, but rather to preserve the role of the Department of Public Safety (DPS) vis-à-vis other state agencies as the state traffic enforcement entity on public highways. Section 80.22 is part of the organizational chapter dealing with DPS. It was enacted in 1939 when DPS was formed, under the heading, "Duplication in Police Officers Prohibited." 1939 Iowa Acts ch. 120, § 95 (codified at Iowa Code § 80.22 (1946)). We believe its primary goal was to allocate responsibility within state government, not to protect motorists by reducing vehicle stops. Notably, it does not affect the ability of municipal and county officials to enforce traffic laws on the same highways. *See* Iowa Code §§ 321.1(50), .6, .485 (2017); *id.* § 331.653(28); *see also State v. Snider*, 522 N.W.2d 815, 818 (Iowa 1994) ("[A] municipal police officer has authority to arrest for state traffic violations anywhere in the state.").

In *State v. Ramirez*, 895 N.W.2d 884, 898 (Iowa 2017), we distinguished *Cline* and declined to grant a motion to suppress in a situation where constitutional rights were not at issue. There we upheld the use in an Iowa criminal prosecution of evidence obtained by a joint federal–state team using an anticipatory warrant that would have been illegal under Iowa law. *Id.* We said,

> Although Ramirez raises article I, section 8 of the Iowa Constitution in his briefing, he does not claim that *the search itself* would have violated the Iowa Constitution. Rather, he maintains only that Iowa statutes do not authorize this type of search and, therefore, it would violate the Iowa Constitution *to admit the results of the search in an Iowa court.* We disagree with that broad proposition.

*Id.*

This language from *Ramirez* has force in the present case. We conclude that article I, section 8 simply has no play in a license revocation

proceeding when the issue is whether to suppress a stop that was supported by reasonable suspicion but exceeded the officer's statutory authority.

In effect, our present task requires us to reconcile two sets of *statutes.* One of them, Iowa Code sections 80.22, 321.2, and 321.477, did not allow DOT officers, before May 11, 2017, to engage in general traffic enforcement on the public highways of the state. *See* Iowa Code § 80.22; *Rilea*, 919 N.W.2d at 388–89. The other, section 321J.13, limits the issues that can be raised in a license revocation proceeding; the officer's statutory authority is not one of those issues. It is the legislature's prerogative to determine priorities as between its own statutes.[1]

One final note: "In construing various provisions of chapter 321J, we have continuously affirmed that the primary objective of the implied consent statute is the removal of dangerous and intoxicated drivers from Iowa's roadways in order to safeguard the traveling public." *Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 594 (Iowa 2011). "[W]e have characterized an administrative license revocation under section 321J.9 as remedial, promoting the overarching remedial purpose of chapter 321J itself." *Id.* at 601. "A remedial statute, like our implied consent law,

---

[1]We do not think the rationale of *Taeger* applies here. In the first place, *Taeger* was based on an interpretation of Iowa Rule of Criminal Procedure 2.33(1), which limits the circumstances under which a criminal case, *once filed*, can be dismissed. *See Taeger*, 781 N.W.2d at 566–67. Rule 2.33(1) does not come into play where the State never initiated an OWI case against the defendant. We are not at liberty to rewrite the rule.

Nor is the option available to rewrite the text of Iowa Code section 321J.13 to expand the scope of what can be raised in a license revocation proceeding. "[W]e have repeatedly said that 'we are bound by what the legislature said, not by what it should or might have said.' " *In re Marshall*, 805 N.W.2d 145, 160 (Iowa 2011) (quoting *Ranniger v. Iowa Dep't of Revenue & Fin.*, 746 N.W.2d 267, 270 (Iowa 2008)).

Constitutional questions may present different issues, but the question here is one of statutory interpretation.

should be liberally construed consistent with its statutory purpose." *State v. Green*, 470 N.W.2d 15, 18 (Iowa 1991).

### IV. Conclusion.

Accordingly, for the reasons stated, we affirm the judgment of the district court denying Westra's petition for judicial review.[2]

**AFFIRMED.**

All justices concur except Wiggins, J., who files a dissenting opinion, and Appel, J., who files a separate dissenting opinion in which Wiggins, J., joins, and McDonald, J., who takes no part.

---

[2]Westra also argues that not allowing him to raise the lack of statutory authority of the DOT officer in a license revocation proceeding would violate both substantive and procedural due process under article I, section 9 of the Iowa Constitution. Yet we do not see what this argument adds to his exclusionary rule argument under article I, section 8. If it is permissible under article I, section 8 to introduce proof that Westra refused to take the chemical test, such evidence also is admissible notwithstanding article I, section 9. Westra does not attack the driver's license suspension on any basis other than the admissibility of his chemical test.

#18–1050, *Westra v. Iowa Dep't of Transp.*

**WIGGINS, Justice (dissenting).**

I respectfully dissent. I think this case presents an important point of law regarding prosecutorial conduct.

In a recent case, we found the state could not dismiss a case in order to avoid an adverse ruling on a motion to suppress. *State v. Taeger*, 781 N.W.2d 560, 567 (Iowa 2010). The rationale for that decision is that the prosecutor cannot manipulate the system in order to ensure Iowa Code section 321J.13(6) is not triggered. *Id.* Manipulation of the criminal justice system undermines the integrity of the criminal justice system.

I see no difference in what the prosecutor did in this case than in *Taeger.* Here the officer arrested Alex Westra. This began the criminal process. The legislature amended the Code in 1999 with the intention to allow a defendant to contest the stop in the criminal proceeding. 1999 Iowa Acts ch. 13, § 22 (codified as amended at Iowa Code § 321J.13(6) (2017)). The legislature did not anticipate the prosecutor would manipulate the system. The prosecutor not filing the information deprived Westra of his right to contest the stop in the criminal case. This manipulation by the prosecutor is no different from the manipulation in *Taeger. See* 781 N.W.2d at 566–67. Accordingly, I would allow Westra to attack the stop in the administrative proceeding to preserve the integrity of the judicial system and carry out the intent of the legislature.

**APPEL, Justice (dissenting).**

I respectfully dissent. The majority opinion in its very first paragraph starts out on the wrong foot when it declares that the question in this case is whether we are going to reverse direction in light of Fourth Amendment precedent. But that is not the question at all. The question is whether Fourth Amendment precedent is sufficiently well-reasoned for us to follow the Fourth Amendment approach under Iowa constitutional law.

> Article I, section 8 of the Iowa Constitution provides,
>
> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8. This provision of the Iowa Constitution is perhaps the most important provision of our Bill of Rights protecting Iowans from an authoritarian state. Early cases emphasized its protean character. Modern pragmatic revisionists have sought, however, to dilute the strength of search and seizure protections and to expand the scope of state authority to search and seize. While in recent years we have resisted such revisions, the majority opinion in this case is a step in the wrong direction. Here is why.

**I. As an Integral Part of our State Constitution's Protection Against Unlawful Search and Seizures, the Exclusionary Rule Applies in Driver's License Revocation Cases.**

**A. Constitutional Footing of Exclusionary Rule.** First, we have rightly held that the exclusionary rule for evidence seized in violation of article I, section 8 is "an integral part of [the] state constitution's protection

against unreasonable searches and seizures." *State v. Cline*, 617 N.W.2d 277, 285 (Iowa 2000), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). In Iowa, then, the exclusionary rule is *substantive constitutional doctrine.*

There is substantial support for the holding in *Cline* that the exclusionary rule is an integral part of substantive constitutional doctrine in Iowa law. In *Reifsnyder v. Lee*, 44 Iowa 101, 102 (1876), we explained in a civil forfeiture proceeding that a party subject to an illegal search should be restored to the party's position prior to the search. The notion in *Reifsnyder* is that a party is entitled to a restorative remedy of being returned to the party's position prior to the constitutional violation. *See id.* Later, in *State v. Height*, 117 Iowa 650, 661, 91 N.W. 935, 938 (1902), we noted that the search and seizure principles were subject to "a broad and liberal interpretation for the purpose of preserving the spirit of constitutional liberty." Finally, in *State v. Sheridan*, 121 Iowa 164, 168, 96 N.W. 730, 731 (1903), the court declared that to use illegally seized evidence to secure a conviction would "emasculate the constitutional guaranty, and deprive it of all beneficial force or effect in preventing unreasonable searches and seizures."[3]

For decades, there was a similar approach under the Fourth Amendment. In *Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341, 346 (1914), *overruled in part by Mapp v. Ohio*, 367 U.S. 643, 645–55, 81 S. Ct. 1684, 1691 (1961), the Supreme Court unanimously held that private papers obtained through an unconstitutional search could not be used in a criminal prosecution. In *Weeks*, Justice Day emphasized that

---

[3]To be sure, in *State v. Tonn*, 195 Iowa 94, 100–01, 191 N.W. 530, 533 (1923), the court, over strong dissent, abandoned the exclusionary rule in a search and seizure case. The approach in *Tonn* was, of course, rejected in *Cline* in favor of our earlier precedent. 617 N.W.2d at 291, 293.

the Fourth Amendment imposed on judges as well as executive officials "limitations and restraints as to the exercise of [their] power and authority." *Id.* at 392, 34 S. Ct. at 344. Further, Justice Day declared that the limitations and restraints "forever secure the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law." *Id.* Justice Day further emphasized that the fruits of illegal searches "should find no sanction in the judgments of the courts, which are charged at all times with the support of the Constitution." *Id.*

As scholars have pointed out, the language of *Weeks* makes clear that the Fourth Amendment imposes obligations on judges, that they have a duty to give full force and effect to the rights secured by the Amendment for both innocent and guilty persons, and that the tendency of officials to violate the Fourth Amendment should find no approval in the courts. *See* Tracey Maclin, *The Supreme Court and the Fourth Amendment's Exclusionary Rule* 11–12 (2013); Thomas K. Clancy, *The Fourth Amendment's Exclusionary Rule as a Constitutional Right*, 10 Ohio St. J. Crim. L. 357, 358–59 (2013).

Similarly, in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S. Ct. 182, 183 (1920), Justice Oliver Wendell Holmes declared in strong, unequivocal language,

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.

Holmes thus believed not only that courts should not be tainted with unconstitutionally obtained evidence, but that it should not be used for any purpose.

And in *Mapp*, 367 U.S. at 649, 81 S. Ct. at 1688, the Supreme Court emphasized the constitutional nature of the exclusionary rule. According to *Mapp*, the exclusion of evidence under search and seizure law was a rule "of constitutional origin." *Id.*; *see also Cline*, 617 N.W.2d at 284. Further, the *Mapp* Court emphasized that its decision "gives to the individual no more than that which the Constitution guarantees him." 367 U.S. at 660, 81 S. Ct. at 1694.

By declaring the exclusionary rule as part of the substance of article I, section 8, we have squarely and firmly rejected the unfortunate innovations of search and seizure doctrine introduced to the Fourth Amendment by the United States Supreme Court in *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620 (1974). In *Calandra*, the Supreme Court, inconsistent with decades of past federal precedent, downgraded Fourth Amendment protections by declaring that the exclusionary rule was merely "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect . . . , rather than a personal constitutional right of the party aggrieved." *Id.* As noted by one commentator, by emphasizing the deterrence function exclusively, the Supreme Court's approach "generates an enormous pressure for reduction of the scope of the rule" through cost–benefit type of analysis. *See* James Boyd White, *Forgotten Points in the "Exclusionary Rule" Debate*, 81 Mich. L. Rev. 1273, 1281 (1983).

By describing the exclusionary rule as a substantive part of our constitutional protections in *Cline*, we recognized that constitutional cement protected it from being washed away based on transient pragmatic concerns that cannot be permitted to overrun our permanent constitutional regime. 617 N.W.2d at 285. Our approach is consistent with other courts. *See, e.g., Dorsey v. State*, 761 A.2d 807, 818 (Del. 2000)

("[T]he efficient prosecution of criminals cannot justify a deliberate invasion of the right of the citizen to be made secure against the violation of specific constitutional guarantee's . . . .") (quoting *Rickards v. State*, 77 A.2d 199, 205 (Del. 1950)); *State v. Guzman*, 842 P.2d 660, 672 (Idaho 1992) (explaining that the exclusionary rule is a constitutionally mandated remedy for illegal searches and seizures); *State v. Eserjose*, 259 P.3d 172, 178 (Wash. 2011) (en banc) (noting that state exclusionary rule accomplishes " 'its paramount concern [of] protecting an individual's right of privacy' . . . by closing the courtroom door to evidence gathered through illegal means" (quoting *State v. Afana*, 233 P.3d 879, 884 (Wash. 2010) (en banc))).

**B. The Exclusionary Rule in Iowa is a Personal Remedy.**
Second, the exclusionary rule in Iowa has long been held to provide a remedy for a constitutional violation. In *Reifsnyder*, we emphasized that under our search and seizure law, the parties should be returned to the position they were before the unconstitutional conduct. 44 Iowa at 102. In *Cline*, we emphasized that the exclusionary rule was a remedy for a constitutional violation. 617 N.W.2d at 289. We emphatically rejected the notion in *United States v. Leon*, 468 U.S. 897, 906, 104 S. Ct. 3405, 3412 (1984) (quoting *Calandra*, 414 U.S. at 348, 94 S. Ct. at 620), that the exclusionary rule was merely "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right." *Cline*, 617 N.W.2d at 289.

The notion that article I, section 8 vests personal rights, of course, is also clear by the language of the provision: "The right of the people to be secure in their persons, houses, papers and effects, . . . ." Iowa Const. art. I, § 8; *see* Morgan Cloud, *A Conservative House United: How the Post-*

*Warren Court Dismantled the Exclusionary Rule*, 10 Ohio St. J. Crim. L. 477, 480 (2013).

**C. The Exclusionary Rule in Iowa Protects the Integrity of the Judiciary.** Third, we have emphasized, among other things, that the exclusionary rule is supported by the need to protect the integrity of the judiciary from using unlawfully obtained evidence to support its judgments. In *Cline*, we noted, "Judges would become accomplices to the unconstitutional conduct of the executive branch if they allowed law enforcement to enjoy the benefits of the illegality." 617 N.W.2d at 290. In *State v. Hamilton*, 335 N.W.2d 154, 158 (Iowa 1983), we emphasized that tainted evidence must be excluded because exclusion "protect[s] the integrity of the judiciary." Our approach in *Cline* thus had a solid pedigree in Iowa caselaw, but also in federal caselaw prior to reconstruction of Fourth Amendment doctrine that occurred in *Calandra. See, e.g., Elkins v. United States*, 364 U.S. 206, 222, 80 S. Ct. 1437, 1447 (1960) (referring to the "imperative of judicial integrity"); *Weeks*, 232 U.S. at 392, 34 S. Ct. at 344; *see also* Robert M. Bloom & David H. Fentin, *"A More Majestic Conception": The Importance of Judicial Integrity in Preserving the Exclusionary Rule*, 13 U. Pa. J. Const. L. 47, 47 (2010); Andrew E. Taslitz, *Hypocrisy, Corruption, and Illegitimacy: Why Judicial Integrity Justifies the Exclusionary Rule*, 10 Ohio St. J. Crim. L. 419, 474 (2013).

This case involves action of an administrative agency. Of course, Holmes has the answer to whether illegally obtained evidence may be used in this kind of proceeding: No! *Silverthorne Lumber*, 251 U.S. at 392, 40 S. Ct. at 183. In any event, even if this case involves a decision by an administrative agency in the first instance, there is a right of appeal to the courts arising out of final agency action. The need to maintain the integrity

of the courts by refusing to consider unconstitutionally obtained evidence therefore applies in this case.

**D. Inapplicability of *Westendorf.*** In support of its position, the State cites *Westendorf v. Iowa Department of Transportation,* 400 N.W.2d 553 (Iowa 1987), *superseded by statute as recognized by Brownsberger v. Department of Transportation,* 460 N.W.2d 449, 450–51 (Iowa 1990). *Westendorf,* however, involved a challenge under the Fourth Amendment and not under the Iowa Constitution. *Id.* at 556. As a result, the *Westendorf* court was bound to follow the diluted post-*Calandra* federal precedents. *See id.* at 556–57. In striking contrast to *Cline,* the *Westendorf* court did not treat the exclusionary rule as part and parcel of the Fourth Amendment, did not regard the search and seizure provisions as providing a personal remedy, and did not cite judicial integrity as an important concern.[4] *See id.*

The method of Fourth Amendment analysis in *Westendorf* is completely different from the analysis of article I, section 8 under *Cline.* In *Cline,* we drew upon traditional approaches, while *Westendorf* relied on recent policy-driven innovations in interpretation of the Fourth Amendment by the United States Supreme Court.

**E. Application of Exclusionary Rule in Civil Contexts.** As noted by Professor LaFave, courts have often applied the exclusionary rule for

---

[4]In addition, *Westendorf* emphasized that there would be "little force as a deterrent of unlawful police action because the department does not control the actions of local police officers." 400 N.W.2d at 557. In this case, however, the unlawful stop was not made by the police, but by employees of the Iowa Department of Transportation, the very same agency seeking to revoke Westra's driver's license. As noted by LaFave, even based on *Calandra,* "the argument for exclusion is most compelling when the administrative agency in question has an investigative function and investigative personnel of that agency participated in the illegal activity for the purpose of providing information to support administrative proceedings against the suspect." 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.7(f), at 340 (5th ed. 2012). Thus, even under federal law, the precedential value of *Westendorf* is doubtful for the present case.

search and seizure violations in administrative settings. According to LaFave,

> Courts have held or at least assumed that the exclusionary rule is applicable in a wide variety of administrative proceedings, including FTC hearings to uncover discriminatory pricing practices, SEC proceedings, OSHA proceedings, proceedings before the public utilities commission to terminate phone service because of illegal use, NLRB hearings concerning labor controversies, immigration hearings, hearings to terminate a public employee's government service, hearings to suspend or revoke a license to practice a profession or to sell liquor, *hearings to suspend or revoke a driver's license*, and hearings to suspend or expel a student from a public high school or a state university.

1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.7(f), at 335–36 (5th ed. 2012) (emphasis added) (footnotes omitted).

It is not surprising that a number of courts have applied the exclusionary rule in driver's license settings. For instance, in *State v. Lussier*, the Supreme Court of Vermont stated in a driver's license context,

> Evidence obtained as the result of constitutional violations by law enforcement officers may not be admitted at trial as a matter of state law because doing so "eviscerates our most sacred rights, impinges on individual privacy, perverts our judicial process, distorts any notion of fairness, and encourages official misconduct."

757 A.2d 1017, 1025 (Vt. 2000) (quoting *State v. Badger*, 450 A.2d 336, 349 (Vt. 1982)). The Vermont court upheld exclusion "to protect the core value of privacy" reflected in the search and seizure provisions of the Vermont Constitution. *Id.* at 1026–27.

In addition, the Vermont court emphasized the need "to promote the public's trust in the judicial system." *Id.* Further, the Vermont court emphasized that the focus of any analysis "should be on the individual constitutional rights at stake." *Id.* at 1025. These observations are

consistent with the approach taken by this court in *Cline* under article I, section 8 of the Iowa Constitution.

Similarly, in *Williams v. Ohio Bureau of Motor Vehicles*, the Ohio court, noting that the exclusionary rule applied in civil forfeiture proceedings, held that a lawful arrest, including a constitutional stop, must take place before a refusal to submit to a test triggers a license suspension. 610 N.E.2d 1229, 1231 (Ohio Mun. Ct. 1992); *see also Watford v. Ohio Bur. of Motor Vehicles*, 674 N.E.2d 776, 778 (Ohio Ct. App. 1996) ("[A] lawful arrest, including a constitutional stop, must take place before a refusal to submit to chemical tests . . . triggers a license suspension."). In *People v. Krueger*, 567 N.E.2d 717, 722 (Ill. App. Ct. 1991), the Illinois appellate court noted that "a suspension may not be predicated on the fruits of unconstitutional police activity." Although the Illinois court rested its decision on statutory interpretation, the court's interpretation was powered by constitutional concerns. *Id.*; *see also Whisenhunt v. State Dep't of Pub. Safety*, 746 P.2d 1298, 1298 (Alaska 1987) (analyzing rationale for exclusion in statutory context); *Pooler v. Motor Vehicle Div.*, 755 P.2d 701, 703–04 (Or. 1988) (en banc) (same).

There is, of course, contrary authority in other states as well. Unlike the case in Iowa, many of these jurisdictions have adopted the eviscerating approach of *Calandra* as part of their local jurisprudence. *See, e.g., Powell v. Sec'y of State*, 614 A.2d 1303, 1307 (Me. 1992) (stating purpose of exclusionary rule was to deter police misconduct); *Riche v. Dir. of Revenue*, 987 S.W.2d 331, 333 (Mo. 1999) (en banc) (same). These cases do not embrace the Iowa view that the exclusionary rule is part of the substance of the constitutional provision, that it provides a remedy for the person subject to unconstitutional conduct, and that it protects the integrity of the courts.

**F. Summary.** Iowa search and seizure law under article I, section 8 of the Iowa Constitution has followed a materially different analytic underpinning than the recent innovations of the United States Supreme Court under the Fourth Amendment. In my view, the principles of our search and seizure law have application in the context of a driver's license revocation.

**II. Constitutionality of Unauthorized Search by Government Agent Under Article I, Section 8 of the Iowa Constitution.**

I now consider the key question in this case and the determinative question in the majority opinion, namely, whether an unauthorized search is an unconstitutional search under article I, section 8 of the Iowa Constitution. This is a close issue. As the majority recognizes, the proposition has been embraced by a number of courts. *See, e.g., State v. Cuny*, 595 N.W.2d 899, 903 (Neb. 1999) (stating stop and detainment unlawful where officer had no statutory authority and requiring suppression of evidence in criminal proceeding under both Fourth Amendment and Nebraska Constitution); *State v. Brown*, 39 N.E.3d 496, 502 (Ohio 2015) (noting that Ohio law is more protective than federal law and holding that stop without statutory authority violated search and seizure clause of Ohio Constitution); *State v. Barker*, 25 P.3d 423, 425–26 (Wash. 2001) (en banc) (stating probable cause alone does not establish authority to arrest under Washington Constitution and requiring suppression of evidence); *see also Commonwealth v. Hernandez*, 924 N.E.2d 709, 712–13 (Mass. 2010) (noting that Massachusetts, like Iowa, rejects the good-faith exception to the exclusionary rule). Other courts, however, have come to the opposite conclusion. *See, e.g., State v. Green*, 354 P.3d 446, 449–51 (Idaho 2015) (noting that similarity of language and purpose does not require the court to follow Fourth Amendment

jurisprudence but finding it persuasive in this case); *State v. Gates*, 145 So. 3d 288, 304 (La. 2014) (stating that stop outside officer's jurisdiction does not require suppression of evidence); *State v. Keller*, 396 P.3d 917, 925–26 (Or. 2017) (holding unauthorized stop does not give rise to constitutional violation under search and seizure provisions of Oregon Constitution under all the facts and circumstances of the case).

To me, the better view is that searches and seizures by government officials are unlawful unless government officials have authority to conduct them. As noted by the Washington Supreme Court in *Barker*, the search and seizure provision of the Washington Constitution "is not a source of authority of law to arrest or stop and detain a person in Washington. There must be some other source of authority of law for a constitutional warrantless arrest." 25 P.3d at 425. Here, there is no source of authority for the arrest. As a result, a constitutional violation under article I, section 8 of the Iowa Constitution is present and the evidence should be suppressed.

I close by noting the narrowness of the holding in this case. The holding in the majority opinion is that where a government official acting without authority executes a stop based on reasonable suspicion of intoxicated driving and administers DUI testing, the evidence may be admitted in a driver's license revocation proceeding without violating article I, section 8 of the Iowa Constitution.

Wiggins, J., joins this dissent.